UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌────────────────────────────────────┐
│ Sarah Hamm,                         │
│                                     │
│            Plaintiff,               │
│                                     │
│      -v-                            │
│                                     │
│ Capsule Corporation d/b/a           │
│ Capsule,                            │
│                                     │
│            Defendant.               │
└────────────────────────────────────┘
```

22-cv-05435 (JSR)

<u>MEMORANDUM ORDER</u>

JED S. RAKOFF, U.S.D.J.:

Defendant Capsule Corporation ("Capsule")[1] moves to compel arbitration of plaintiff Sarah Hamm's putative class action complaint, citing an arbitration clause in Capsule's terms and conditions of service ("TOC") apparently requiring arbitration. Hamm argues that Capsule has failed to meet its burden to show that she affirmatively agreed to Capsule's TOC and can therefore be bound by them and argues that they do not cover her claim in any event and are unenforceable. This Court agrees with Capsule and therefore stays this case pending arbitration pursuant to 9 U.S.C. § 3.

## I.  Legal Standard

The Federal Arbitration Act ("FAA") provides that a "written provision in any . . . contract . . . to settle by arbitration a

---

[1] All capitalized terms here used refer to the definitions set forth in this order, unless otherwise specified. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. If a party to any such contract sues in federal court, the court, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . . " Id. § 3. Although the "FAA reflects a liberal federal policy favoring arbitration agreements," arbitration will not be compelled where it is plain that no actual agreement to arbitrate has been made. Meyer v. Uber Techs, Inc., 868 F.3d 66, 73 (2d Cir. 2017). Whether a contract to arbitrate exists is determined by reference to state contract law. Id. at 73-74.

"In deciding motions to compel [arbitration], courts apply a standard similar to that applicable for a motion for summary judgment, . . . draw[ing] all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Id.

## II.  Analysis

Hamm raises four arguments against enforcing the arbitration agreement contained in Capsule's TOC. *First*, she argues that Capsule has failed to establish her agreement to Capsule's TOC. Pls. Opp. to Def. Mot. Compel Arbitration ("Opp.") at 3-8, Dkt. 16. *Second*, she

argues that, assuming she did agree to Capsule's TOC, including the arbitration clause, her claims fall outside the scope of what she agreed to arbitrate. Id. at 15-16. *Third*, she argues that assuming she agreed to Capsule's TOC and that her claims fall within the scope of the arbitration clause, the contract is not enforceable because it was unconscionable or because her assent to it was fraudulently induced. Id. at 13-15, 16-21. And *fourth*, she argues that Capsule's motion is not supported by adequate admissible evidence. Id. at 8-13.

For the reasons explained below, the Court disagrees with each of these arguments.

**A. Whether a contract was formed**

According to an affidavit submitted by Capsule's CEO, Capsule customers including Hamm sign up for an account by entering their email address and clicking a 'CONTINUE' button, immediately below which Capsule displays the message: "By clicking continue, I accept the Capsule Terms of Service, Privacy Policy, and HIPAA Policy." Declaration of Eric Kinariwala ("Kinariwala Decl.") ¶ 4, Dkt. 15. The message includes embedded links for the terms of service, the privacy policy, and the HIPAA policy that a user can click on and access. Id. An image of the relevant screen is copied here:

‹ Delivery

## Great! Add your email address

Enter your email so we can save your progress

Email

Please enter a valid email address.

CONTINUE

By clicking continue, I accept the Capsule Terms of Service, Privacy Policy, and HIPAA Policy.

Id.

Hamm does not appear to dispute that this is how she signed up for Capsule's services. Though she submitted a declaration stating that she "may have made a transaction on Capsule's website," but that she "did not know, or ever notice, any Terms of Service," "did not click on any agreement related to a 'Terms of Service,'" and "did not think I was agreeing to anything when I made a transaction with Capsule," she does not actually dispute that she did enter her email address and click a 'Continue' button displayed immediately next to the aforementioned message. Opp. Ex. 1, Declaration of Sarah Hamm ("Hamm Decl.") ¶ 4, Dkt. 16-1. And her legal filings include a screenshot of the exact same screen presented by Capsule, along with a description of that screen as representing what "[a] consumer purchasing through [Capsule's] website" can see. Opp. at 6.

In determining whether a consumer is bound by terms putatively pertaining to an online transaction, courts look for a "[m]utual manifestation of assent, whether by written or spoken word or by

conduct. . . ." <u>Specht v. Netscape Comms. Corp.</u>, 306 F.3d 17, 29 (2d Cir. 2002).[2] Courts have generally enforced terms where a consumer affirmatively clicked boxes marked 'I agree' or something similar, while they have often declined to enforce terms included in a hyperlink that a user can only access or observe by scrolling to the relevant portion of the screen. <u>Meyer</u>, 868 F.3d at 75.

The situation presented here -- where a user affirmatively clicks a button that does not state 'I agree' and does not come directly after the user views the terms and conditions, but where clicking on the button nonetheless signals some willingness to transact and the text immediately adjoining the button advertises and links to the relevant terms and indicates that, by clicking, the user is agreeing to them -- was explicitly addressed by the Second Circuit in <u>Meyer</u>. There, the Court found that Uber's terms and conditions were enforceable because they were "reasonably conspicuous" and that users were therefore on notice of them when they clicked a transact button directly above a link to the relevant terms. <u>Id.</u> at 77. The Court in <u>Meyer</u> emphasized that the relevant "screen [was] uncluttered" because it included only the fields the user needed to fill in, the relevant

---

[2] Both <u>Specht</u> and <u>Meyer</u> were based on the Second Circuit's understanding of California law. <u>Meyer</u>, 868 F.3d at 74; <u>Specht</u>, 306 F.3d at 29. Here, the parties appear to agree that New York law governs. Mem. Supp. Def. Mot. Compel Arbitration ("Def. Mem.") at 5; Opp. at 4, 8, 18. But as <u>Meyer</u> noted, California and New York "apply substantially similar rules for determining whether the parties have mutually assented to a contract term," <u>Meyer</u>, 868 F.3d at 74, and the parties have noted no relevant difference between New York and California law here.

button marked 'REGISTER', and the message warning users that by creating an account, they were agreeing to the hyperlinked terms. Id. at 78, 81 Addendum A. The link to the relevant terms was placed "directly below the buttons for registration." Id. at 78. And "[t]he entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service." Id.

The situation here is, in almost every relevant respect, identical to Meyer. According to both parties' presentations, the terms and conditions appear on a single screen with the button that a consumer is asked to click. Kinariwala Decl. ¶ 4; Opp. at 6. The message that links to the terms and conditions is placed even closer to the relevant button than it was in Meyer; here, it comes immediately below the 'CONTINUE' button, whereas in Meyer there were alternate buttons a user could select to pay by Paypal or Google Wallet between the 'REGISTER' button and the message linking to the relevant terms. Meyer, 868 F.3d at 81-82. The screen is more "uncluttered" than in Meyer, as there are no fields for a user to fill out other than a single field for the user's email address.

During argument on Capsule's motion, Hamm's counsel noted two differences between the screen at issue here and that in Meyer. First, whereas in Meyer the message informing users that they were agreeing to Uber's terms was rendered in black as against a white background and the hyperlinked terms were rendered in electric blue, id. at 78, here the full message including the hyperlinked terms is rendered in

green. Kinariwala Decl. ¶ 4. And second, in <u>Meyer</u> the relevant "REGISTER" button came after users entered their credit card information, whereas here it came after users enter an email address. Neither difference carries the weight Hamm urges.

As to the first difference, it is true that <u>Meyer</u> put some weight on the color contrast between the black text of the warning, the electric blue of the hyperlinked terms, and the white background, because the contrast helped make clear that the terms were "reasonably conspicuous." <u>Meyer</u>, 868 F.3d at 77-78. And, at oral argument, counsel for Hamm cited <u>Cullinane v. Uber Techs., Inc.</u>, 893 F.3d 53 (1st Cir. 2018), in which the First Circuit found relevant that, based on the record before it in that case, Uber's terms of service "did not have the common appearance of a hyperlink" because, unlike in <u>Meyer</u>, they were not "blue and underlined." <u>Id.</u> at 63. <u>Cullinane</u> was decided under Massachusetts law, <u>id.</u> at 61, and this Court is not convinced that its analysis is reconcilable with the Second Circuit's analysis of California and New York law in <u>Meyer</u>. But even in <u>Cullinane</u>, the fact that the hyperlinked terms of service were not blue and underlined was "not dispositive," and the Court's decision rested more generally on its conclusion based on "the overall content of the [relevant] screens . . . that the 'Terms of Service & Privacy Policy' hyperlink was not a conspicuous term as defined by Massachusetts law." <u>Id.</u> at 63.

Here, it would be difficult to conclude that Capsule's terms and conditions were not reasonably conspicuous, at least under the standard the Second Circuit set out in <u>Meyer</u>. Although the fact that they were

rendered in green rather than electric blue may have made them less immediately eye-catching, they were placed much closer in space to the 'CONTINUE' button than the linked terms were to the 'REGISTER' button in Meyer. Moreover, the screen here was less cluttered than the screen in Meyer, with essentially nothing on it except the field to enter an email address, the 'CONTINUE' button, and the message advertising agreement and linking to Capsule's TOC. As such, the Court cannot conclude that just because the message alerting users to their agreement with Capsule's TOC was in green, it was not also reasonably conspicuous.

And as to the second difference Hamm points to between this case and Meyer -- the fact that the terms and conditions in Meyer were advertised at a moment when a user had just entered credit card information before clicking "REGISTER," whereas here they were advertised after a user entered an email address before clicking 'CONTINUE' -- Hamm cites no authority, and the Court is aware of none, showing this to be a relevant distinction. During argument, Hamm's counsel argued that being asked to enter credit card information connotes transactional finality and therefore puts users on greater notice that they are likely to be bound to contractual terms than merely entering one's email address before clicking 'CONTINUE.' But the Second Circuit did not mention the fact that users were asked to enter credit card information as a relevant factor in Meyer. And it would have been odd to put any weight on that fact, because users in Meyer were not actually completing a transaction -- which might be the

sort of thing, under Hamm's apparent theory, that would place a user on notice of the need to look out for contractual terms -- but were merely creating an account to use in future transactions. Meyer, 868 F.3d at 70-72. That is what users appeared to be doing by entering their email address and clicking 'CONTINUE' here. Kinariwala Decl. ¶ 4.

Further, even if these putative differences between the situation here and in Meyer carried any weight, Hamm's complaint specifically alleges that she personally "read and relied on the Capsule Privacy Policy when she made her decision to transact with Defendant." Compl. ¶ 27, Dkt. 1; id. ¶¶ 24, 26-30, 135-36, 140, 212, 218-19, 225, 233-234, 238, 241 (making further allegations about what reasonable consumers would expect based on reading Capsule's privacy policy). As noted above, the very privacy policy that Hamm alleges she "read and relied on" was displayed and linked to in the very same message below the 'CONTINUE' button that advertised and linked to Capsule's TOC. Kinariwala Decl. ¶ 4. At least assuming that Hamm accessed Capsule's privacy policy when she signed up for her account (which is what she appears to allege, Compl. ¶ 27), a reasonable consumer in her position who read and relied on the privacy policy would also have had notice of Capsule's TOC. And though Capsule made precisely this argument in its motion to compel, Def. Mem. 1, Hamm did not attempt to reconcile this seeming contradiction in either her responsive papers or her declaration (for instance, by explaining that she accessed Capsule's privacy policy in some way other than clicking on the link immediately

beneath the 'Continue' button, if that were the case). In light of the evidence before it, the Court therefore concludes that any reasonable user who had read Capsule's privacy policy would not have lacked notice of its TOC.

For these reasons, the Court finds that Capsule's TOC were reasonably conspicuous and that Hamm agreed to them.

### B. Whether Hamm's claims fall outside the scope of Capsule's TOC

Hamm also argues that her claims do not fall under the scope of her arbitration clause with Capsule. Opp. at 15-16. The clause states that the customer and Capsule "agree to resolve any claims relating to these Terms or the Services through final and binding arbitration, except as set forth under Exceptions to Agreement to Arbitrate below or where prohibited by law." Kinariwala Decl. Ex. B, Capsule Terms of Service at 8, Dkt. 15-2.[3] Hamm argues that because the contract is for "pharmacy services," her claims relating to the alleged leak of her private medical information do not relate to the terms of her contract. Opp. at 15.

But the arbitration clause clearly covers disputes relating both to the terms themselves, and to Capsule's provision of "services," which is defined as "your use of Capsule's pharmacy services, website, mobile application, products, and other technology platforms

---

[3] None of the exceptions are relevant here. For instance, while the contract permits suits "solely for injunctive or equitable relief," id. at 9, Hamm's suit seeks actual and punitive damages, Hamm Compl. at 51, Prayer for Relief. Hamm does not contend her suit falls under any exception to the arbitration provision.

(collectively, the 'Service')." Capsule Terms of Service at 1. As described above, Hamm's claims relate to Capsule's alleged failure to store her data in a responsible way, including by failing to act in accordance with the privacy policy on which Hamm alleges she relied in agreeing to use Capsule's services. Compl. ¶27; see id. ¶¶ 24, 26-27, 29, 135-36, 140, 212, 218-19, 225, 233-234, 238, 241. That Privacy Policy, though linked to separately from the TOC, is explicitly included by the TOC as part of the entire agreement between the parties to which the arbitration clause applies: "You and Capsule agree that these Terms, together with the Privacy Policy, are the complete and exclusive statement of the mutual understanding between you and Capsule with respect to the Services . . . ." Capsule Terms of Service at 9.

While Hamm cites one case declining to enforce an arbitration clause where "no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider," that case concerned a claim by someone who happened to be an AT&T customer (and who had therefore had consented to arbitrate claims against AT&T as part of her AT&T phone service agreement) that AT&T was making unsolicited marketing calls and texts in violation of the Telephone Consumer Protection Act -- claims that could just easily have been brought by any other person whose phone service was not through AT&T. Wexler v. AT&T Corp., 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016). Under those circumstances, the court read the relevant arbitration agreement

as not extending to the customer's claims against AT&T that arose totally independent of her phone service agreement with AT&T. Id.; see also McFarlane v. Altice USA, Inc., 524 F. Supp. 3d 264, 276-77 (S.D.N.Y. 2021) (declining to enforce as unconscionable an arbitration provision in a consumer contract between a cable company and its customers that putatively required the arbitration of all claims between the parties, where the claims in question related not to the consumer contract but rather to claims brought by the company's employees about their employment when the employees also happened to be the company's customers).

Here, by contrast, Hamm's claims relate to Capsule's storage of information she gave to Capsule in connection with her use of Capsule's services, and, even more specifically, to Capsule's alleged failure to follow through on promises made through its privacy policy. Though they are not claims for breach of contract, the claims clearly arise out of Hamm's use of Capsule's services -- similar to the (also non-contractual) claims of the Uber drivers in Meyer. 868 F.3d at 72. As such, Hamm's claims plainly relate to and are covered by Capsule's terms and conditions, including the arbitration clause.

### C. Whether Hamm's contract with Capsule is unenforceable because it is unconscionable or was fraudulently induced.

Hamm also argues that any contract formed with Capsule is invalid because it was fraudulently induced by virtue of Capsule's allegedly false representations about its privacy and security protocols, Opp. at 13-15, and is substantively and procedurally unconscionable, id.

at 16-21. But her arguments on both points do not involve anything about the arbitration agreement itself. Since Hamm's arguments on these points do not relate "to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006); see also Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 61 (2d Cir. 2012) (stating that "claims of fraud in the inducement of the contract generally," as opposed to those relating specifically to the arbitration provision, "must be decided by the arbitrator").

Hamm does not allege she was fraudulently induced into the contract by virtue of false promises relating to her ability to pursue claims in court, rather than through arbitration, and her arguments as to unconscionability also largely do not appear to relate to the arbitration clause but rather to other aspects of the contract (such as Capsule's purported ability to change terms unilaterally, Opp. at 19).[4] As such Hamm's arguments relating to fraud or to unconscionability should be made to the arbitrator, not this Court.

_____

[4] Indeed, to the extent Hamm argues that the mere fact that Capsule's contract requires arbitration is unconscionable, that argument would be squarely foreclosed by the Supreme Court's interpretation of the Federal Arbitration Act. See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (holding that a California common law rule that mandatory arbitration provisions with class action waivers were unconscionable were preempted by the FAA).

**D. Whether Capsule has failed to meet its evidentiary burden to show an enforceable agreement between it and Hamm.**

Finally, Hamm raises various evidentiary issues with Capsule's motion to compel arbitration. She argues that Capsule has failed to lay a proper foundation for establishing that the TOC it has submitted (included as an exhibit to a declaration submitted under penalty of perjury by Capsule's CEO) are authentic and were actually in place when Hamm signed up for Capsule's services. Opp. at 9. She also contends that Capsule's CEO's assertions that Hamm signed up for Capsule's services on February 23, 2022 and did not exercise her right to opt out of the arbitration provision are hearsay and would violate the best evidence rule. Opp. at 11; see Kinariwala Decl. ¶ 3.

These contentions lack merit. As Capsule's CEO, Kinariwala is in a place to know how users go about signing up for services, what date they did so, and what terms were in place and advertised on those dates. As described above, the Second Circuit has described the evidentiary standard for deciding whether to compel arbitration is similar to the summary judgment standard. Nicosia, 834 F.3d at 229. And while a party may defeat summary judgment by demonstrating "that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2) (emphasis added), that is different from requiring parties to submit evidence at this stage in the precise form it would be presented in at trial.

Hamm offers no reason to think that Capsule's evidence of the TOC in place the day she signed up could not be properly authenticated at trial, nor any reason to think such evidence could only be presented as hearsay not subject to any exception. Nor has she created any dispute of fact relating to Capsule's evidence; while she states in her own declaration that she "did not know about the 'Terms of Service' and do not believe [she] was ever notified on the Capsule website about them or ever presented with them," Hamm Decl. ¶ 4, she does not actually dispute that the terms were available and linked immediately beneath a 'CONTINUE' button when she signed up to create her account.

As such, there is no genuine material factual dispute concerning whether Hamm signed up for Capsule's terms and conditions.

**III. Conclusion**

For the reasons stated above, the Court grants Capsule's motion to compel arbitration. Pursuant to 9 U.S.C. § 3, this case is stayed pending the completion of arbitration. The parties are directed to jointly call chambers within 5 business days of a final ruling in arbitration (or other resolution of their claims) to discuss any further proceedings.

SO ORDERED.

New York, NY
September 26, 2022

_____
JED S. RAKOFF, U.S.D.J.